UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

**Guardian Angel Credit Union,
on its own behalf and on behalf
of a class of persons similarly
situated**

   **v.**         Case No. 08-cv-261-PB
                 Opinion No. 2010 DNH 074
**MetaBank, and Meta Financial
Group, Inc.**

## MEMORANDUM AND ORDER

Guardian Angel Credit Union ("Guardian Angel") has renewed its motion to certify a plaintiffs' class action against MetaBank and Meta Financial Group, Inc. (collectively, "MetaBank"). MetaBank objects, arguing that Guardian Angel cannot meet the requirements of Federal Rule of Civil Procedure 23. For the reasons given below, I grant Guardian Angel's motion to certify.

## I.  BACKGROUND

On or about April 15, 2005, Guardian Angel deposited $99,000 with MetaBank through the use of third-party broker Jumbo CD Investments, Inc. ("Jumbo"). Guardian Angel received a certificate of deposit ("CD") evidencing the deposit, naming MetaBank as the obligor and outlining the terms of the deposit,

along with a cover letter from Charlene Pickhinke, who at the time was a branch manager of MetaBank's Sac City, Iowa branch. Guardian Angel renewed the CD on or about April 17, 2006 and again on or about April 17, 2007.  Guardian Angel had no direct contact with MetaBank and all of its transactions with MetaBank and Pickhinke were arranged by Jumbo.

On or about January 25, 2008, MetaBank sent Guardian Angel a letter stating that MetaBank had "recently become aware of unauthorized certificates of deposit . . . issued under its logo and brand name."  (Compl. - Class Action - Jury Trial Demand (hereinafter "Compl.") Ex. E, Doc. No. 1-5.)  Pickhinke allegedly absconded with Guardian Angel's deposit as well as deposits made with MetaBank by other members of the potential class totaling approximately $4.2 million in face value.

The proposed class consists of individuals and legal entities residing and/or doing business within the United States of America who satisfy the following criteria:  (a) the class member made a deposit with MetaBank, or any predecessor-in-interest, parent or subsidiary, or any employee, representative or agent thereof, with the intention of receiving a CD from such institution; (b) MetaBank, or any employee, representative or

agent thereof, issued the class member a CD on account of such deposit; (c) a MetaBank employee, representative or agent, whether current or former, has absconded with the deposit made by the class member; and (d) as of the date of Guardian Angel's complaint, MetaBank has failed to repay the class member the deposit that it made and/or any accrued interest.  (Compl., Doc. No. 1, ¶ 21.)  As of December 1, 2009, there were forty-one potential class members spread across twenty-two states from Hawaii to New Hampshire.[1]  (Pl.'s Mem. of Law in Supp. of Its Renewed Mot. for Class Certification, Doc. No. 49-1, at 8.)

---

[1] There are currently only thirty-eight potential class members.  Three of the forty-one original putative class members have settled.  (See Cesare Aff., Doc. No. 52-2, ¶ 4 (noting that two lawsuits had settled and one, Methodist Hospitals of Dallas v. Metabank, was scheduled for trial); http://courts.dallascounty.org (a search for cases including the party "Methodist Hospitals of Dallas" yielded a court docket showing that Methodist Hospitals was dismissed following a settlement).)

Although five other parties have filed individual suits, they may choose to opt in if a class is certified.  One of the five lawsuits was dismissed without prejudice, presumably to await action in this matter, and the other four are still pending.  (See Cesare Aff., Doc. No. 52-2, ¶¶ 2-4.)  Guardian Angel's counsel has spoken with a number of class members who would consider dismissing their individual suits and joining the class if it were certified.  (See Pl.'s Reply Brief Regarding Its Renewed Mot. for Class Certification, Doc. No. 55, at 10; Meier Aff., attach. in paper format to Doc. No. 49, ¶ 19.)

Guardian Angel alleges that Pickhinke defrauded each putative class member in a substantially identical manner. First, Pickhinke contacted at least three CD brokers, including Jumbo, AVD Investments, and Great Eastern Management ("the brokers"), and represented that Metabank had one-year term $99,000 jumbo CDs to sell to institutional investors. (See id. ¶ 6.) Pickhinke provided the brokers with information regarding MetaBank and instructions for making deposits to obtain the CDs. (Id.) The brokers in turn sent their customers information sheets that included the terms of the CDs and instructions about how to wire money to procure a CD. (Id.; see also Pl.'s Ex. 8, attach. in paper format to Doc. No. 49 (copies of the instruction sheets received by Guardian Angel and other putative class members; these sheets show that the CDs offered around the same time had similar, but not identical, terms).[2]) All but two of the putative class members used the services of a broker, and there is no indication that the two remaining class members, who presumably communicated directly with Pickhinke, received materially different information. (See Pl.'s Mem. of Law in

---

[2] To the extent that any of the documents referenced in plaintiff's memorandum of law in support of its renewed motion for class certification are sealed, I hereby unseal them.

Supp. of Its Renewed Mot. for Class Certification, Doc. No. 49-1, at 4 n.2.)  After receiving the relevant information, all but one of the putative class members then wired funds to MetaBank's corporate account at the Federal Home Loan Bank, naming MetaBank as the "beneficiary's bank," itself as the "beneficiary," and including "Attention Charlene" or a similar reference to the Sac City branch of MetaBank in the instructions.[3]  (Id. ¶ 7.)  When the funds arrived in Metabank's corporate account, MetaBank's accounting department notified Pickhinke, who credited each deposit to her own fraudulent account at MetaBank rather than to any account in the name of the class member.  (Id.)  Pickhinke then sent each investor a cover letter on MetaBank stationary accompanied by two copies of the CD -- one for safekeeping and one to sign and return -- in a MetaBank envelope.  (See id.; see also Pl.'s Ex. 10, attach. in paper format to Doc. No. 49.)  Finally, Pickhinke then "regularly issued monthly interest checks to the depositors according to the terms of the CD, drawn against her fraudulent account at MetaBank."  (Pl.'s Mem. of Law in Supp.

---

[3] One class member deposited the funds for the CD by check. (Pl.'s Mem. of Law in Supp. of Its Renewed Mot. for Class Certification, Doc. No. 49-1, at 4 n.3.)

Almost all of the investors deposited the same amount ($99,000), but one deposited $95,000 and another deposited $100,000.  (Id. at 4 n.4.)

of Its Renewed Mot. for Class Certification, Doc. No. 49-1, ¶ 6.)
None of the putative plaintiffs have received any interest since
January 2008, and none have been able to recover their initial
deposits.  (Id. ¶ 7.)

Guardian Angel's complaint includes four counts.  Count One
alleges that MetaBank's failure to repay the deposit and each
class member's accrued interest constitutes a breach of contract.
In this count, Guardian Angel argues that Pickhinke had actual
and/or apparent authority to bind MetaBank with respect to such
contracts.  Count Two alleges that MetaBank was negligent in the
hiring, retention, and supervision of Pickhinke.  Count Three
alleges that MetaBank is vicariously liable for Pickhinke's acts
and omissions, including conversion, fraud, theft, and
negligence.  Count Four seeks attorney's fees and costs.

I denied Guardian Angel's first motion for class
certification because Guardian Angel failed to show that common
issues would predominate over individual legal and factual
issues. (See Mem. and Order, Doc. No. 29, at 19.)   Guardian
Angel now renews its motion for class certification and bolsters
its previous arguments regarding the predominance of common legal
and factual issues.

-6-

## II.  <u>CLASS CERTIFICATION STANDARD</u>

Federal Rule of Civil Procedure 23 sets out the requirements for class certification.  The proposed class representative must demonstrate that each of Rule 23's requirements has been satisfied.  <u>Makuc v. Am. Honda Motor Co., Inc.</u>, 835 F.2d 389, 394 (1st Cir. 1987).  The class certification inquiry has two steps. First, the class representative must show that the proposed class satisfies all four of Rule 23(a)'s threshold requirements, which are commonly known as numerosity, commonality, typicality, and adequacy.  Fed. R. Civ. P. 23(a)(1)-(4); <u>see also</u> <u>Berenson v. Nat'l Fin. Servs. LLC</u>, 485 F.3d 35, 38 (1st Cir. 2007).  Second, the class representative must demonstrate that the lawsuit may be maintained as a class action under one of the three subsections of Rule 23(b).  Fed. R. Civ. P. 23(b).  Guardian Angel argues that its class should be certified under Rule 23(b)(3), which requires that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." <u>Id.</u>

Although the Supreme Court has stated that a court should not decide the merits of a case at the certification stage, Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177-78 (1974), a motion to certify "generally involves considerations that are 'enmeshed in the factual and legal issues comprising the plaintiff's cause of action.'" Coopers & Lybrand v. Livesay, 437 U.S. 463, 469 (1978) (quoting Mercantile Nat'l Bank v. Langdeau, 371 U.S. 555, 558 (1963)).  The First Circuit has determined that "[a] district court must conduct a rigorous analysis of the prerequisites established by Rule 23 before certifying a class."  Smilow v. Southwestern Bell Mobile Sys., Inc., 323 F.3d 32, 38 (1st Cir. 2003); see also Gintis v. Bouchard Transp. Co., 596 F.3d 64, 66 (1st Cir. 2010).  In doing so, a district court may resolve disputed factual issues that arise in the course of class certification by considering materials beyond the pleadings.  In re PolyMedica Corp. Sec. Litig., 432 F.3d 1, 6 (1st Cir. 2005).

### III.  ANALYSIS

Guardian Angel asserts that its complaint satisfies all of Rule 23(a)'s prerequisites and that the class is eligible for certification under Rule 23(b)(3).  MetaBank challenges both

-8-

contentions.  I address each issue relevant to the determination of class certification in turn.

## A.   **Rule 23(a)**

### 1.   **Numerosity**

Plaintiffs must first demonstrate that the proposed class "is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1); see Gen. Tel. Co. of the Nw. v. EEOC, 446 U.S. 318, 330 (1980) ("The numerosity requirement requires examination of the specific facts of each case and imposes no absolute limitations.").  A court should consider both the number of members in the proposed class and their geographical distribution in determining whether the proposed class satisfies the numerosity requirement.  See Andrews v. Bechtel Power Corp., 780 F.2d 124, 131-32 (1st Cir. 1985).  "[T]he difficulty inherent in joining as few as [forty] class members should raise a presumption that joinder is impracticable . . . ."  1 Alba Conte & Herbert Newberg, Newberg on Class Actions § 3.5, at 247 (4th ed. 2002).  Although the proposed class only includes thirty-eight[4] members, I find that the proposed class satisfies the numerosity requirement because it would be impractical to join

---

[4] See footnote 1, supra.

-9-

thirty-eight parties whose diverse geographic locations span the United States.

### 2.   **Commonality**

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "[I]f the predominance standard [of Rule 23(b)(3)] is met, the Rule 23(a)(2) prerequisite is necessarily satisfied." 2 Conte & Newberg, supra, § 4:22. Because I conclude below that the predominance standard is satisfied, I also conclude that the class meets the commonality threshold.

### 3.   **Typicality**

To satisfy the typicality requirement, the class representatives' injuries must arise from the same event or course of conduct as the injuries of other class members, and their claims must be based on the same legal theories. See Modell v. Eliot Sav. Bank, 139 F.R.D. 17, 22 (D. Mass. 1991). In this case, Guardian Angel alleges the same injury -- the loss of $99,000[5] plus interest -- arising from the same course of conduct: Pickhinke's acts of providing false information about

---

[5] Two investors deposited $95,000 and $100,000, respectively. See footnote 3, supra.

available CDs, collecting investors' funds through wire transfers, issuing unauthorized CDs, and absconding with the investors' funds.

Metabank argues that Guardian Angel's claims are subject to unique defenses because (1) Guardian Angel bought its CD through its broker, Jumbo, and had no direct contact with MetaBank or Pickhinke; (2) Guardian Angel did not verify the information Jumbo provided and, if it had, it would have discovered that MetaBank did not offer the CD Pickhinke was purporting to sell; and (3) Guardian Angel failed to obtain an executed copy of its unauthorized CD.  (See Defs.' Mem. of Law in Opp'n to Pl.'s Renewed Mot. for Class Certification, Doc. No. 52, at 24.)  These arguments are unpersuasive.  First, almost all of the putative class members purchased their CDs through brokers, and there is no evidence that those who communicated directly with Pickhinke received materially different information from those who dealt with brokers.  In addition, the defendants provide no evidence that any of the other plaintiffs verified the information their brokers provided or obtained executed copies of their CDs.  Thus, Guardian Angel appears to be subject to typical, rather than unique, defenses.  Furthermore, even if any of these potential

defenses were unique, they do not "divert attention from the common claims of the class," <u>In re Bank of Boston Corp. Sec. Litig.</u>, 762 F. Supp. 1525, 1532 (D. Mass. 1991), because the common issues predominate over the potential unique defenses. Accordingly, I find that the proposed class satisfies the typicality requirement.

### 4. Adequacy

The fourth and final prerequisite of Rule 23(a) is that the representative parties must "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  To satisfy this prerequisite, plaintiffs must show (1) "that the interests of the representative party will not conflict with the interests of any of the class members" and (2) that the "counsel chosen by the representative party is qualified, experienced and able to vigorously conduct the proposed litigation." <u>Andrews</u>, 780 F.2d at 130.  MetaBank does not dispute that Guardian Angel fulfills the first part of this requirement.

MetaBank, however, argues that Guardian Angel does not meet the second part of the requirement because its counsel's actions thus far demonstrate that they are unable to vigorously conduct the proposed litigation.  MetaBank points to two facts as

evidence of counsel's inadequacy:  (1) the fact that plaintiff has failed to conduct a single deposition, and (2) the fact that plaintiff waited nine months after the expiration of the deadline for amendment of pleadings to file its motion to amend its complaint.[6]  (See Defs.' Mem. of Law in Opp'n to Pl.'s Renewed Mot. for Class Certification, Doc. No. 52, at 25.)  Guardian Angel responds that it did not need to conduct its own depositions because the deposition testimony that it received from counsel to other parties suing MetaBank, combined with documentary evidence, was sufficient to support its motion for class certification.  (See Pl.'s Reply Br. Regarding Its Renewed Mot. for Class Certification, Doc. No. 55, at 14; Meier Aff., attach. in paper format to Doc. No. 49, ¶¶ 2-6.)  In addition, Guardian Angel argues that its counsel's failure to assert the UCC claim until after consultation with an expert was excusable as there is an absence of case law that would support such a

---

[6] MetaBank also notes that "[t]he deposition testimony of the Plaintiff's representatives revealed that neither they, nor anyone else at the credit union, even reviewed the Complaint or the original Motion for Class [C]ertification before they were filed."  (See Defs.' Mem. of Law in Opp'n to Pl.'s Renewed Mot. for Class Certification, Doc. No. 52, at 25.)  This fact, however, does not shed light on plaintiff's counsel's qualifications, experience, or ability to vigorously conduct the litigation, nor does it show that the interests of Guardian Angel will conflict with the interests of other class members.

claim.  (<u>See</u> Pl.'s Reply Br. Regarding Its Renewed Mot. for Class
Certification, Doc. No. 55, at 14.)  Finally, Guardian Angel
notes that its counsel have experience with class action
litigation and have already taken steps to vigorously conduct the
litigation, including speaking with representatives of thirty-
three of the proposed class members and the three relevant
brokers.  (<u>See</u> <u>i</u>d. at 13; Meier Aff., attach. in paper format to
Doc. No. 49, ¶¶ 18, 20.)  MetaBank has cited no case law, nor
have I found any, that suggests that Guardian Angel's counsel's
performance has fallen below the standards of Rule 23(a).
Accordingly,  I find that Guardian Angel meets the adequacy
requirement.

**B.    <u>Rule 23(b)(3)</u>**

     A class may proceed under Rule 23(b)(3) if two criteria are
met.  First, common questions of law or fact must predominate
over any questions affecting only individual members.  Fed. R.
Civ. P. 23(b)(3).  Second, a class action must be "superior to
other available methods for fairly and efficiently adjudicating
the controversy."  <u>Id.</u>  These two requirements ensure that class
certification is granted "only where the adjudication of common
issues in a single action will achieve judicial economies and

practical advantages without jeopardizing procedural fairness."
Rothwell v. Chubb Life Ins. Co. of Am., 191 F.R.D. 25, 29 (D.N.H.
1998).

MetaBank presents two arguments against predominance.
First, MetaBank argues that individual legal issues will
predominate if the case is tried as a class action because each
plaintiff's claims will be governed by the law of the plaintiff's
state rather than the law of Iowa, the state where MetaBank was
based and the place where Pickhinke worked.  Second, MetaBank
claims that even under Iowa law, the plaintiffs' claims will
present unique factual issues that will defeat predominance.  In
addition, MetaBank argues that a class action is not a superior
method of adjudication in this case.

### 1.   __Predominance of Common Legal Issues__

MetaBank's legal complexity argument depends on its
assertion that New Hampshire choice-of-law principles require the
application of many states' laws to the putative class members'
claims.  MetaBank is correct that New Hampshire choice-of-law
principles govern:  a federal court must apply the forum state's
choice-of-law rules when, as in this case, federal jurisdiction
is based on diversity of citizenship.  Klaxon Co. v. Stentor

Elec. Mfg. Co., 313 U.S. 487, 496 (1941).  Choice-of-law

questions also must be answered on an issue-by-issue basis.

LaPlante v. Am. Honda Motor Co., 27 F.3d 731, 741 (1st Cir.

1994).  Thus, I use New Hampshire law to separately analyze the

choice-of-law issues that are presented by each of Guardian

Angel's three claims.[7]

### a.   Breach of Contract/Apparent Authority Claim

Guardian Angel alleges that the issuance of a CD in exchange

for a deposit of funds creates a contract, that Pickhinke had

apparent authority to issue the relevant CDs, and thus that

Pickhinke bound MetaBank to contracts with each putative class

member when she issued the relevant CDs.  Guardian Angel

therefore claims that MetaBank is liable for breach of contract

because it refuses to repay the deposits and interest to the

class members.  (See Compl., Doc. No. 1, ¶¶ 30-32.)  MetaBank

does not appear to disagree that the issuance of a CD generally

creates a contract or that failure to repay the amount of the CD

generally would constitute a breach of that contract.  Therefore,

---

[7] Choice-of-law analysis is only necessary where a New
Hampshire law actually conflicts with the law of another
interested state.  Keeton v. Hustler, 549 A.2d 1187, 1191 (N.H.
1988).  For the purposes of analysis, I assume -- as MetaBank
contends -- that the relevant state laws are in conflict.

the key issue is whether Pickhinke had apparent authority to issue the relevant CDs.

Whether a principal is bound by an agent's contract is a question of agency law.  See <u>FASA Corp. v. Playmates Toys, Inc.</u>, 869 F. Supp. 1334, 1343 (N.D. Ill. 1994).  The New Hampshire Supreme Court has not adopted a specific rule to resolve choice-of-law questions in the agency context.  The court has, however, articulated choice-of-law rules for tort and contract cases.  In <u>Clark v. Clark</u>, 222 A.2d 205 (N.H. 1966), a tort case, the New Hampshire Supreme Court described five "choice-influencing considerations" (sometimes referred to as "the Leflar factors") that it would henceforth use to answer choice-of-law questions: (1) predictability of results, (2) maintenance of reasonable orderliness and good relationships among the states, (3) simplification of the judicial task, (4) advancement of the forum state's governmental interest, and (5) preference for what the court regards as the sounder rule of law.  See <u>id.</u> at 208-209. More recently, however, the New Hampshire Supreme Court has resolved a number of contract choice-of-law questions by looking to the Restatement (Second) of Conflict of Laws (hereinafter "Second Restatement"), which states that in the absence of

express choice by the parties, a contract should be governed by the law of the state with which the contract has its most significant relationship.  See, e.g., Consol. Mut. Ins. Co. v. Radio Foods Corp., 240 A.2d 47, 49 (N.H. 1968); Mathena v. Granite State Ins. Co., 525 A.2d 284, 285-86 (N.H. 1987); Ellis v. Royal Ins. Cos., 530 A.2d 303, 306 (N.H. 1987).  In Glowski v. Allstate Ins. Co., 589 A.2d 593 (N.H. 1991), the court acknowledged the divergence between its approaches to tort and contract cases, and explained why using the Second Restatement's approach for certain cases was appropriate:

> Our post- Clark decisions, particularly in contracts cases, have relied upon the approach taken by the Restatement (Second) of Conflict of Laws . . . . However, adoption of the Second Restatement position does not suggest that a Clark analysis is no longer applicable.  Rather, it is a recognition that, for specific problems, the "choice-influencing considerations" do not provide enough guidance to reach the correct result.  Because predictability of results, the first Clark factor, is perhaps of greatest concern in contracts cases, the adoption of the more mechanical approach of the Second Restatement is appropriate in those cases.  In actual fact, the policy behind the Second Restatement substantially mirrors those considerations contained in Leflar's work.

Id. at 595; see also, e.g., Green Mountain Ins. Co. v. George, 634 A.2d 1011, 1013 (N.H. 1993) (abrogated on other grounds by Matarese v. N.H. Mun. Ass'n Prop.-Liab. Ins. Trust, Inc., 791

A.2d 175 (N.H. 2002)) (applying the "most significant

relationship" test in a contract case), Cercere v. Aetna Ins.

Co., 766 A.2d 696, 698 (N.H. 2001) (same).

The Clark factors are not a good fit for the types of

choice-of-law problems that are presented by questions of agency

law.  Thus, this analysis follows the approach of the Second

Restatement, which has articulated a specific choice-of-law rule

for cases in which a third party seeks to hold an alleged

principal liable for the acts of an agent.  According to the

Second Restatement,

> (1) Whether a principal is bound by action taken on his
> behalf by an agent in dealing with a third person is
> determined by the local law of the state which, with respect
> to the particular issue, has the most significant
> relationship to the parties and the transaction under the
> principles stated in § 6.

Restatement (Second) Conflict of Laws § 292(1) (1971).[8]  Section

---

[8] Section 292(2) goes on to explain that "[t]he principal
will be held bound by the agent's action if he would so be bound
under the local law of the state where the agent dealt with the
third person, provided at least that the principal had authorized
the agent to act on his behalf in that state or had led the third
person reasonably to believe that the agent had such authority."
Restatement (Second) Conflict of Laws § 292(2) (1971).  The
Restatement's comment on § 292(2) states that it is an
"application" of § 292(1), id. cmt. e., but a leading treatise
treats it as an exception.  See Eugene F. Scoles et al., Conflict
of Laws § 18.32 (4th ed. 2004).  I need not resolve this apparent
conflict.  As I explain below, I conclude that § 292(1) requires

6 lists seven "factors" to consider when conducting choice-of-law analysis,[9] but the first comment to § 292(1) distills these factors down to two requirements:  (1) "the relationship between the principal and agent" must "make[] it reasonable to hold the principal bound by the agent's act" and (2) there must be "a reasonable relationship between the principal and the state whose local law is to be applied."  Id. cmt. c.

---

the application of Iowa law.  Section 292(2) could not be read to require the application of another state's law in this case unless "the principal had authorized the agent to act on his behalf in that state or had led the third person reasonably to believe that the agent had such authority."  Restatement (Second) Conflict of Laws § 292(2) (1971).  For obvious reasons, MetaBank does not make either such contention.

[9] Section 6 lists the following factors as relevant to any choice-of-law analysis:

> (a) the needs of the interstate and international systems,
> (b) the relevant policies of the forum,
> (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
> (d) the protection of justified expectations,
> (e) the basic policies underlying the particular field of law,
> (f) certainty, predictability and uniformity of result, and
> (g) ease in the determination and application of the law to be applied.

Restatement (Second) of Conflict of Laws § 6 (1971).

Here, I conclude that the state with the most significant relationship to the parties and the transaction, as related to the agency question, is Iowa.  Most importantly, the relationship between MetaBank and Pickhinke, which is key to the question of agency, was centered there.  Pickhinke worked in an Iowa bank, and all of the interactions between MetaBank and Pickhinke appear to have taken place in Iowa.  In addition, Pickhinke made false communications to the putative class members from Iowa, the class members sent funds to Iowa to purchase CDs, and the alleged conversion occurred in Iowa.

MetaBank never explicitly claims that the law of each putative class member's state should govern that class member's contract claim, but claims that Guardian Angel "improperly truncate[d] the necessary legal analysis" by failing to mention relevant conduct that occurred outside of Iowa.  (See Defs.' Mem. of Law in Opp'n to Pl.'s Renewed Mot. for Class Certification, Doc. No. 52, at 16.)  MetaBank notes that a number of important events occurred outside of Iowa.  First, brokers made representations to putative class members regarding Pickhinke's unauthorized CDs outside of Iowa.  (See id.)  In addition, all of the putative class members, save those from Iowa, received

misleading information outside of Iowa.  Furthermore, they decided to purchase CDs from Pickhinke, initiated funds transfers to pay for the CDs, deposited their "interest" checks, and were allegedly injured outside of Iowa.  (See id.)

These events, however, are not particularly relevant to the relationship between MetaBank and Pickhinke.  Furthermore, it is not clear that MetaBank has a "reasonable relationship" with each putative class member's state such that holding it accountable under that state's law would be appropriate under the Second Restatement.  See Restatement (Second) Conflict of Laws § 292 cmt. c.  MetaBank has not suggested that it actually authorized Pickhinke to conduct any business in the putative class members' states.  See id. cmt. d ("The principal will have a reasonable relationship to a state where he has authorized the agent to act on his behalf.").  MetaBank may or may not have led third parties to believe that Pickhinke was authorized to act in those states.  See id. ("The principal will have a reasonable relationship to a state where he has not authorized the agent to act on his behalf, if, nevertheless, he has led the third person reasonably to believe that the agent was authorized to act on his behalf in that state.").  The Restatement also notes that a principal may

-22-

have an adequate relationship with a state to support use of that state's law in other situations, but only specifically mentions one such situation:  where the principal-agent relationship is centered in that state.  See id. ("If the principles developed [in the field of vicarious liability] are transferable to the field of agency, the principal will have an adequate relationship to the state where his relationship to the agent is centered.).  The relationship between Pickhinke and MetaBank is certainly not centered in any of the putative class members' states, except for Iowa.

MetaBank also argues that Guardian Angel cannot prevail because it has not met its "burden of providing an 'extensive analysis' of state law variations."  (Defs.' Mem. of Law in Opp'n to Pl.'s Renewed Mot. for Class Certification, Doc. No. 52, at 14 (quoting Walsh v. Ford Motor Co., 807 F.2d 1000, 1017 (D.C. Cir. 1986)).)  MetaBank appears to expect Guardian Angel to explain the law of apparent authority in each of the putative class members' states before deciding that Iowa law should apply.  If the relevant choice-of-law rule commanded courts to compare those substantive laws, MetaBank might be correct that Guardian Angel had not met its burden.  In the case of agency questions,

however, the court must only conclude that the state whose law is
applied bears the most significant relationship to the parties
and the transaction.  In order to determine what state bears the
most significant relationship to the parties and the
transactions, I need only know where the relevant events
occurred, not what the law of apparent authority is in each
state.  In short, because Guardian Angel has shown that Iowa has
the most significant relationship to the parties and transaction
at issue here, I conclude that I must apply Iowa law to the
agency question.  Accordingly, I conclude that common legal
issues will predominate for this claim.

### b.   <u>Vicarious Liability Claim</u>

Guardian Angel claims that MetaBank is vicariously liable
for Pickhinke's conversion and/or fraud.  In order to determine
whether individual legal issues will predominate, I must decide
which state's or states' laws will apply to the vicarious
liability claims.  New Hampshire has not adopted a specific
choice-of-law rule for vicarious liability questions.  Because
vicarious liability is a subspecies of agency law, the <u>Clark</u>
factors are not useful here for the same reasons that they are a
poor fit when analyzing a choice-of-law issue concerning apparent

authority.  Thus, I again turn to the Second Restatement for

guidance.[10]

---

[10] My decision to use the Second Restatement's approach is
not outcome determinative.  The result here would be the same if
I applied the Clark choice-of-law rule.

The first Clark factor, predictability of results, points in
favor of Iowa law.  Iowa was the center of gravity of Pickhinke's
relationship with MetaBank.  Thus, if MetaBank had any
expectations regarding potential tort liability, it should have
expected Iowa law to govern whether it would be held accountable
for the torts of its Iowa employees.  In addition, it was or
should have been predictable to the putative class members that
Iowa law would govern any claims arising from their investments.
Pickhinke instructed the brokers to instruct their clients to
wire money to a bank in Iowa, and the investors did so.  The
investors were or should have been aware that the bank was in
Iowa because its address was on the instruction sheet.

Regarding the second factor, maintenance of good
relationships among the states, application of Iowa law is
appropriate because Iowa has "a substantial connection with the
total facts and the particular issue being litigated."  LaBounty
v. Am. Ins. Co., 451 A.2d 161, 163-64 (N.H. 1982).

Applying Iowa law is also consistent with the third
consideration, simplification of the judicial task, because it
will be simpler for one court to adjudicate the claims as a class
action than for multiple courts to separately adjudicate these
claims.

The fourth consideration is advancement of the forum's
governmental interest.  This factor is either neutral or points
slightly in favor of applying Iowa law because it will be helpful
to Guardian Angel, a New Hampshire entity, to certify the class,
and because certification will lead to a more efficient
administration of justice.  See Clark, 222 A.2d at 208-209.

Applying Iowa law is also consistent with the fifth factor,
the court's preference for applying the sounder rule of law,
because Iowa law is not "outmoded, an unrepealed remnant of a
bygone age, a drag on the coattails of civilization," or
"obsolete and senseless."  Id. at 209 (internal quotation marks
omitted).

The Second Restatement's section on vicarious liability explains that "[t]he law selected by application of the rule of § 145[, the general tort choice-of-law provision,] determines whether one person is liable for the tort of another person." Restatement (Second) of Conflict of Laws § 174 (1971).  According to § 145,

> (1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.[11]
>
> (2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
>     (a) the place where the injury occurred,
>     (b) the place where the conduct causing the injury occurred,
>     (c) the domicil[e], residence, nationality, place of incorporation and place of business of the parties, and
>     (d) the place where the relationship, if any, between the parties is centered.
>
> These contacts are to be evaluated according to their relative importance with respect to the particular issue.

Id. § 145 (1971).

With respect to the issue of vicarious liability, I conclude that Iowa has the most significant relationship to the occurrence

---

[11] See footnote 9, supra, for a list of the principles stated in § 6.

and the parties here.  It is true that most of the putative class
members resided outside of Iowa, received misleading information
outside of Iowa, decided to purchase CDs outside of Iowa,
initiated funds transfers outside of Iowa, and deposited their
"interest" checks outside of Iowa.  In addition, all the putative
class members, save those from Iowa, were allegedly injured
outside of Iowa when MetaBank refused to return their initial
deposits.  These contacts, however, are relatively unimportant
with respect to the issue of vicarious liability.  The fact that
the relationship between Pickhinke and MetaBank was centered in
Iowa, on the other hand, is of primary importance with respect to
that issue.  Pickhinke worked at an Iowa bank and there is no
evidence that she and MetaBank interacted outside of Iowa.  In
addition, there were other less important contacts with Iowa:
Pickhinke communicated with brokers from Iowa, requested that the
putative class members send funds for CDs to Iowa, and allegedly
committed fraud and conversion in Iowa.

Accordingly, I conclude that Iowa law applies to this claim
and that common legal issues will predominate.

### c.   **Negligent Hiring and Supervision Claim**

Guardian Angel claims that MetaBank was negligent in hiring

and supervising Pickhinke.  MetaBank contends that I must apply
the laws of multiple states to the class members' negligent
hiring and supervision claims, and thus that individual legal
issues will predominate.  To determine whether I must use the
laws of many states or may simply use Iowa law, I look to the
Clark choice-of-law rule because this is a tort claim.

Clark's first choice-of-law consideration -- predictability
-- points toward Iowa law.  The alleged negligent hiring and
supervision took place in Iowa, and the relationship between
MetaBank and Pickhinke was confined to Iowa.  It is predictable
that any problems arising out of this relationship would be
governed by Iowa law, even if those problems resulted in injuries
to entities outside the state.

The remaining factors do not point strongly either in favor
of or against applying Iowa law.  The second consideration,
"maintenance of reasonable orderliness and good relationships
among the [s]tates," requires only that "a court not apply the
law of a [s]tate which does not have a substantial connection
with the total facts and the particular issue being litigated."
LaBounty v. Am. Ins. Co., 451 A.2d 161, 163-64 (N.H. 1982).  Iowa
clearly has a substantial connection to the overall transaction

-28-

and the specific issue at hand, since any negligence took place
in Iowa.

Regarding the third consideration, simplification of
judicial task, it is no simpler to apply New Hampshire's laws, as
opposed to Iowa's, on negligent hiring and supervision.  If
anything, certifying the class and applying Iowa law will
simplify the broader judicial task by confining these claims to
one court and having the claims adjudicated under one state's law
rather than forcing multiple courts to adjudicate MetaBank
lawsuits under different legal standards.

The fourth consideration is advancement of the forum's
governmental interest.  Clark notes that "[i]n most private
litigation the only real governmental interest that the forum has
is in the fair and efficient administration of justice." 222
A.2d at 208.  This case will proceed more efficiently if it
proceeds as a class action and all of the claims are adjudicated
under the law of a single state.  Thus, this factor is either
neutral or points slightly in favor of applying Iowa law.

The final consideration -- the preference for applying the
sounder rule of law -- is neutral.  This consideration requires
only that courts avoid applying a law that is "outmoded, an

unrepealed remnant of a bygone age, a drag on the coattails of civilization," or "obsolete and senseless."  Id. at 209 (internal quotation marks omitted).  MetaBank has failed to demonstrate that the law of Iowa is outmoded or senseless, and thus this factor does not require me to avoid using Iowa law.  Accordingly, I conclude that I may apply Iowa law and that common legal issues predominate in the claim for negligence.

### 2.   Predominance of Common Factual Issues

Having concluded that Iowa law will govern all of the class members' claims, I must now determine whether common factual issues will predominate when those claims are analyzed under Iowa law.  In order to determine if common factual issues predominate, I must determine whether the plaintiffs will need to present individualized evidence to prevail on each claim.

### a.   Apparent Authority/Breach of Contract Claim

Under Iowa law, "[f]or apparent authority to exist, the principal must have acted in such a manner as to lead persons dealing with the agent to believe the agent has authority." Clemens Graf Droste Zu Vischering v. Kading, 368 N.W.2d 702, 711 (Iowa 1985); see also Chismore v. Marion Sav. Bank, 268 N.W. 137, 139 (Iowa 1936) ("Apparent authority, as between the principal

-30-

and third persons, must always be determined by the acts of the principal, and not those of the agent.  The authority must have been actually apparent to the third person who must have dealt with the agent in reliance thereon in good faith and in the exercise of reasonable prudence.").

MetaBank argues that whether Pickhinke had apparent authority is not susceptible to class-wide proof.  According to Metabank, "mini-trials will be necessary" to "evaluate, among other things, [(1)] whether MetaBank made any representations to [each] putative class member, [(2)] whether the putative class member relied on such representations in making its investment decision, and [(3)] whether it was reasonable for [the] putative class member to do so."  (See Defs.' Mem. of Law in Opp'n to Pl.'s Renewed Mot. for Class Certification, Doc. No. 52, at 9.)

The short answer to these arguments is that MetaBank has offered nothing beyond conclusory assertions to suggest that the evidence that bears on Guardian Angel's apparent authority claim will differ substantially from plaintiff to plaintiff.  First, I have no reason to question Guardian Angel's assertion that both Pickhinke and MetaBank acted in substantially similar ways with respect to each class member.  Second, while reliance is an

-31-

element of an apparent authority claim under Iowa law, any individual issues of reliance are not so significant as to predominate over other common issues.  The same is true with respect to the reasonableness of any reliance that is proved. Therefore, common issues will predominate with respect to this claim.

### b.   **Vicarious Liability Claim**

Under Iowa law, an employer can be held liable for the intentional torts of an employee if those torts are committed "while the employee is acting within the scope of his or her employment."  Weems v. Federated Mut. Ins. Co., 220 F. Supp. 2d 979, 992 (N.D. Iowa 2002) (interpreting Iowa law).

> [F]or an act to be within the scope of employment the conduct must be of the same general nature as that authorized or incidental to the conduct authorized.  The question, therefore, is whether the employee's conduct is so unlike that authorized that it is substantially different, or, stated another way, a deviation from the employer's business or interest to pursue the employee's own business or interest must be substantial in nature to relieve the employer from liability.  [T]he ultimate question in determining whether an employee's conduct falls within the scope of employment is whether or not it is just that the loss resulting from the servant's acts should be considered as one of the normal risks to be borne by the business in which the servant is employed.

Id. (internal quotation marks and citations omitted; alterations

in original).  The questions presented by this standard appear to

be susceptible to class-wide adjudication.  To determine whether

MetaBank's loss from Pickhinke's acts should be considered "one

of the normal risks to be borne" by a bank, one need not know

anything about Pickhinke's or MetaBank's interactions with the

individual putative class members.

     MetaBank argues that Guardian Angel cannot prove the

underlying tort of fraud without resorting to individualized

proof.[12]  MetaBank contends that in order to prove fraud,

Guardian Angel must prove that Pickhinke made a material

---

[12] MetaBank pays scant attention to the question of whether
the elements of conversion are amenable to class-wide proof.
MetaBank only notes that Guardian Angel "has not made any attempt
to plead the required elements" of that claim.  (See Defs.' Mem.
of Law in Opp'n to Pl.'s Renewed Mot. for Class Certification,
Doc. No. 52, at 12.)  It appears that MetaBank's primary
intentional tort claim is for conversion, but I discuss in the
text above whether the claim for fraud is amenable to class-wide
proof in case Guardian Angel proceeds under that theory.  I
briefly address the conversion claim here in case Guardian Angel
proceeds under that theory instead or in addition.  Under Iowa
law, "[t]he essential elements of conversion are:  1) ownership
by the plaintiff or other possessory right in the plaintiff
greater than that of the defendant; 2) exercise of dominion or
control over chattels by defendant inconsistent with, and in
derogation of, plaintiff's possessory rights thereto; and 3)
damage to plaintiff."  Bearbower v. Bearbower, 426 N.W.2d 392,
394 n.1 (Iowa 1988).  Proof of these elements will not require
extensive individual evidence.  Thus, the conversion claim is
also amenable to class-wide adjudication.

misrepresentation upon which the putative class members

"justifiably relie[d]," which it cannot do on a class-wide basis.

Beeck v. Kapalis, 302 N.W.2d 90, 94 (Iowa 1981); (see also Defs.'

Mem. of Law in Opp'n to Pl.'s Renewed Mot. for Class

Certification, Doc. No. 52, at 13).  I reject this argument.

Pickhinke made materially identical representations to all of the

putative class members.  Therefore, the issues of whether the

putative class members relied on Pickhinke's representations and

whether that reliance was reasonable are amenable to class-wide

analysis.

### c.   Negligent Hiring and Supervision Claim

Under Iowa law, a plaintiff must prove the following

elements to make out a negligent hiring claim:

> (1) that the employer knew, or in the exercise of ordinary
> care should have known, of its employee's unfitness at the
> time of hiring; (2) that through the negligent hiring of the
> employee, the employee's incompetence, unfitness, or
> dangerous characteristics proximately caused the resulting
> injuries; and (3) that there is some employment or agency
> relationship between the tortfeasor and the defendant
> employer.

Stricker v. Cessford Const. Co., 179 F. Supp. 2d 987, 1018 (N.D.

Iowa 2001) (internal quotation marks omitted).  None of these

elements require individualized evidence from the putative class

members.

The elements of negligent retention or supervision, as
extrapolated by a district court in Iowa, are as follows:

> (1) the employer knew, or in the exercise of ordinary care
> should have known, of its employee's unfitness at the time
> the employee engaged in wrongful or tortious conduct; (2)
> through the negligent retention or supervision of the
> employee, the employee's incompetence, unfitness, or
> dangerous characteristics proximately caused injuries to the
> plaintiff; and (3) there is some employment or agency
> relationship between the employee and the defendant
> employer.

Id. at 1019.  Similarly, none of these elements require
individualized evidence from the putative class members.

MetaBank argues that the plaintiffs must prove that MetaBank
had a duty to each of them in order to prevail on the negligence
claim, and that in order to prove the "duty" element, the
plaintiffs must each prove the nature of their relationship with
MetaBank.  Guardian Angel, however, does not suggest that any of
the plaintiffs had any other relationship with MetaBank besides
the relationship that arose out of their interactions with
Pickhinke.  Because these interactions were essentially
identical, no individualized inquiries would be necessary even if
MetaBank is correct that Guardian Angel must prove the element of
"duty."  Therefore, common factual inquiries will predominate for

this claim.

### 3.  **Superiority**

Before certifying a class action, a court must conclude that such a suit is "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).  Rule 23 provides the following non-exhaustive list of factors to consider in making this determination:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
> (D) the likely difficulties in managing a class action.

Id.

Metabank argues that class treatment is not superior here because eight entities besides Guardian Angel have initiated law suits, indicating their interest in controlling their suits. (See Defs.' Mem. of Law in Opp'n to Pl.'s Renewed Mot. for Class Certification, Doc. No. 52, at 19.)  A leading treatise, however, notes that while "[t]he pendency or lack thereof of separate actions at the time when class certification is being considered may be relevant to [the issue of whether the putative class members have an interest in controlling their suits,] . . . most

-36-

courts agree that the pendency or lack thereof of other actions is not conclusive of this issue or of the propriety of class certification." 2 Conte & Newberg, supra, § 4:29, at 257.  The same treatise notes that although "[a] multiplicity of separate actions may indicate interest in individually controlling separate actions, . . . the 'burden that separate suits would impose . . . upon the court calendars' which could be avoided by a class suit 'may also fairly be considered' in weighing this interest." Id. § 4:29, at 258 (quoting Rules Advisory Committee Notes to 1966 Amendments to Rule 23, 39 F.R.D. 69, 104).

Here, a number of the parties that have sued independently have expressed willingness to drop their suits if this court certifies a class action.  (See Pl.'s Reply Br. Regarding Its Renewed Mot. for Class Certification, Doc. No. 55, at 10; Meier Aff., attach. in paper format to Doc. No. 49, ¶ 19.)  This willingness suggests that the other parties are not especially interested in controlling their own suits.  Furthermore, given the factual and legal issues common to the class, certifying this class would save significant amounts of time in other courts. Finally, it is not undesirable to concentrate the litigation in this forum, nor are there particular difficulties associated with

managing this class action.  Accordingly, I conclude that a class action is superior to other forms of litigation in the present case.


## IV.   <u>CONCLUSION</u>

For all of the foregoing reasons, I grant the plaintiff's renewed motion for class certification (Doc. No. 49).

SO ORDERED.

/s/Paul Barbadoro
Paul Barbadoro
United States District Judge

May 5, 2010

cc:  Christine B. Cesare, Esq.
     Randall F. Cooper, Esq.
     Bruce W. Felmly, Esq.
     Christopher T. Meier, Esq.
     Rachel E. Barber Shwartz, Esq.