**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

<u>Guardian Angel Credit Union,</u>
<u>on its own behalf and on</u>
<u>behalf of a class of persons</u>
<u>similarly situated</u>

   **v.**                                    **Case No. 08-cv-261-PB**
                                        Opinion No. 2011 DNH 111

<u>MetaBank and</u>
<u>Meta Financial Group</u>


<u>**MEMORANDUM AND ORDER**</u>


     This case was spawned by the actions of a rogue bank
employee who used her position at the bank to induce
approximately fifty different institutions to transfer funds to
the bank under the pretext that the funds would be used to
purchase certificates of deposit ("CDs").  The employee then
diverted the money into accounts at the bank that were under her
control and issued fraudulent CDs in the bank's name.  The
scheme was eventually detected and the employee is now in
prison.  The current action is an attempt by a class of victims
to recover against the bank.  The named plaintiff is Guardian
Angel Credit Union.  The defendants are MetaBank and its parent,

Meta Financial Group.[1]   The rogue employee is Charlene
Pickhinke.

Guardian Angel asserts three causes of action on behalf of
the class.  First, it argues that MetaBank is liable for breach
of contract because Pickhinke had apparent authority to bind
MetaBank to agreements to issue the CDs.  Second, it claims that
MetaBank is liable for negligently supervising Pickhinke.
Finally, it argues that MetaBank is vicariously liable for
conversion and other torts committed by Pickhinke.  Guardian
Angel also seeks to recover attorney's fees on behalf of the
class.

The matter is before me on cross-motions for summary
judgment.


## I.  BACKGROUND

MetaBank is a federally chartered bank insured by the
Federal Deposit Insurance Corporation and headquartered in Storm
Lake, Iowa.  Decl. of Danny O. Reynolds, Doc. No. 103-2

---

[1]  MetaBank was formerly known as First Federal Savings Bank of
the Midwest.  In this Memorandum and Order, I refer to both
defendants collectively as MetaBank.

("Reynolds Decl."), at ¶¶ 4-5.  Pickhinke was an employee of the
bank for approximately twenty-eight years, working at its Sac
City, Iowa branch.  Id. at ¶ 7.  Pickhinke eventually became an
office supervisor.  Id. at ¶ 8.  Her general duties included
opening new accounts for customers, marketing deposit accounts,
and increasing the volume of deposits for the bank.  Dep. of
Danny Reynolds, Pls.' Ex. 100 ("Reynolds Dep."), at 54-58.  In
performing these duties Pickhinke was authorized to issue CDs,
send and receive wire transfers, move money between accounts,
accept deposits, and open accounts, all without any oversight or
approval from superiors.  Id. at 53-54; Navigant Consulting,
Inc. Report of Investigation of Potentially Fraudulent Employee
Acts at MetaBank, Inc., Pls.' Ex. 83A ("NCI Report"), at 5-6.
She also had access and authority to use MetaBank's forms and
stationary to process CD purchases.  Reynolds Dep. at 60.

     Although MetaBank has not produced written policies that
limit the authority of bank employees to issue CDs, there is
evidence in the record that it had policies in place when
Pickhinke worked there that would have required her to obtain a
supervisor's approval before: (1) issuing CDs "at or near
$100,000," (2) selling CDs to institutions outside of MetaBank's

geographic market in Iowa or South Dakota; or (3) using CD brokers to sell CDs.  Id. at 52, 58; Reynolds Decl. at ¶¶ 6-8. Even if these policies existed - a point Guardian Angel contests - the policies were not disclosed to customers or other third parties.  Reynolds Dep. at 52-59.

Pickhinke used a variety of CD brokers to find her victims. A representative of one such broker, AVD Investments, testified in a deposition that he was told by an unnamed MetaBank employee at some point in 1995 that Pickhinke was the person that AVD should contact with respect to CDs.  Deposition of Ted Adams, Doc. No. 103-13 ("Adams Dep."), at 26.  AVD subsequently obtained information from Pickhinke about her CD offerings and shared it with potential customers and other CD brokers.  Id. at 26-30.

Pickhinke induced Guardian Angel to purchase what it thought was a $99,000 MetaBank CD in April 2005.  At that time, Guardian Angel's office manager, Diane Gilbert, received a fax proposing the investment from Jumbo Investments, Inc., a CD broker that had learned of the offering from AVD Investments. Deposition of Diane Gilbert, Doc. No. 103-7 ("Gilbert Dep."), at 64-65; deposition of Chris Duncan, Doc. No. 103-11 ("Duncan

4

Dep."), at 52-54.  The fax stated that the CD would be issued by MetaBank, and it specified that the investment proceeds should be wired to MetaBank's account at the Federal Home Loan Bank ("FHLB").  Jumbo Fax, Doc. No. 103-9, at 1.  The fax included a fictitious mailing address, telephone number and fax number for MetaBank.  Reynolds Decl. ¶¶ 27-29.  It also stated that communications concerning the CD should be directed to Pickhinke's attention.  Jumbo Fax at 1.  Gilbert took the fax to Guardian Angel's CEO, Gerald Dumoulin, who was responsible for Guardian Angel's investments.  Gilbert Dep. at 45-47.  Dumoulin decided to purchase the CD based on the advertised interest rate and the fact that MetaBank was FDIC-insured.  Deposition of Gerald Dumoulin, Doc. No. 103-6 ("Dumoulin Dep."), at 95.

After Guardian Angel decided to purchase the CD, it wired $99,000 to MetaBank's FHLB account.  Wire Detail, Doc. No. 103-10, at 1.  The Wire Detail identified MetaBank as the beneficiary financial institution and Guardian Angel as the originating financial institution.  Id. at 1-2.  Pickhinke then sent Guardian Angel a letter on MetaBank stationary with an original CD and signature card on a form that also included the MetaBank logo.  Reynolds Decl. at ¶ 15.  The account number

provided on the fraudulent CD did not correspond with an actual MetaBank account.  Id. at ¶ 25.  Pickhinke completed the internal compliance paperwork for the wire, falsely listing an entity other than Guardian Angel as the originator beneficiary. Wire/Funds Transfer Transaction Record, Pl's Ex. 30A ("Wire Record"), at 1.  She subsequently transferred the funds out of MetaBank's FHLB account and deposited them into the MetaBank account that she had opened in a fictitious name.  Reynolds Decl. at ¶ 22.  Guardian Angel renewed the unauthorized CD twice before it discovered the fraud, once in April 2006 and once in April 2007.  Aff. of Gerald Dumoulin, Pls.' Ex. 112 ("Dumoulin Aff."), at 2.  Pickhinke paid Guardian Angel interest on the fictitious account as it became due until her scheme was discovered.  Id.

Pickhinke began her criminal scheme in 1995 and succeeded in stealing a total of approximately four million dollars from approximately fifty institutional investors before she was caught in 2007.  NCI Report at 1.  Her method of operation in those cases was similar to the method she employed in her dealings with Guardian Angel.  Id. at 4-5.

## II.   <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate when "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A party seeking summary judgment must first identify the absence of any genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The burden then shifts to the nonmoving party to "produce evidence on which a reasonable finder of fact, under the appropriate proof burden, could base a verdict for it; if that party cannot produce such evidence, the motion must be granted."  Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 94 (1st Cir. 1996).  On cross-motions for summary judgment, the standard of review is applied to each motion separately.  See Am. Home Assurance Co. v. AGM Marine Contractors, Inc., 467 F.3d 810, 812 (1st Cir. 2006).

## III.   <u>ANALYSIS</u>

Plaintiffs assert claims for breach of contract, negligent supervision, and conversion.  They also seek to recover attorney's fees.  All of the plaintiffs' claims are governed by Iowa law.  See Doc. No. 58.

7

**A.   MetaBank's Summary Judgment Motion**

**1.  Breach of Contract**

Plaintiffs invoke the doctrine of apparent authority in arguing that MetaBank is liable for breach of contract.[2]

**a.  Law**

Apparent authority is "authority which, although not actually granted, has been knowingly permitted by the principal or which the principal holds the agent out as possessing." Magnusson Agency v. Pub. Entity Nat'l Co.-Midwest, 560 N.W.2d 20, 25-26 (Iowa 1997); see also Chismore v. Marion Sav. Bank, 268 N.W. 137, 139 (Iowa 1936).

Iowa courts have looked to the Restatement (Third) of Agency when resolving issues of apparent authority.  See Frontier Leasing Corp. v. Links Eng. LLC, 781 N.W.2d 772, 776

_____

[2] Plaintiffs also argue that MetaBank is liable solely because it accepted deposits from the plaintiffs into its FHLB account. Plaintiffs claim that MetaBank's acceptance of the deposits created a contract regardless of whether Pickhinke acted with actual or apparent authority.  The cases plaintiffs cite for this proposition are distinguishable, as they held that a depositor has a right to recover money it deposits into its own account.  See Andrew v. Colo. Sav. Bank, 219 N.W. 62, 64 (Iowa 1928); Officer v. Officer, 94 N.W. 947, 948 (Iowa 1903). Plaintiffs' deposits were made to MetaBank's FHLB account and were transferred to Pickhinke's fraudulent personal account.  No deposits were ever made into any of the plaintiffs' personal accounts.

(Iowa 2010).  The Restatement provides that a person acts with apparent authority "when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations." Restatement (Third) of Agency § 2.03 (2006).

In explaining this concept, the Restatement identifies several legal principles that are relevant here.  First, the Restatement notes that a principal's manifestations may result from conduct as well as words.  Thus, "if the principal places a person in a position or office with specific functions or responsibilities, from which third parties will infer that the principal assents to acts by the person requisite to fulfilling the specific functions of responsibilities, the principal has manifested such assent to third parties."  Id. at § 1.03, cmt. b.  In such a case, "[a] third party who interacts with the person, believing the manifestation to be true, need not establish a communication made directly to the third party by the principal to establish the presence of apparent authority. . . ."  Id.  This is true even if the principal's manifestations are unintended.  Id. at § 1.03, cmt. d.

Second, the Restatement recognizes that a principal's undisclosed limitations on an agent's actual authority will not limit the scope of the apparent authority that results from the principal's manifestations.  Id. at § 2.03, cmt. c ("Restrictions on an agent's authority that are known only to the principal and the agent do not defeat or supersede the consequences of apparent authority for the principal's legal relations, apart from the principal's legal relations with the agent").  Further, a third party ordinarily has no duty to inquire into undisclosed limits on an agent's apparent authority.  Id. at § 3.03, cmt. b.

Third, a principal's manifestations of apparent authority need not be communicated directly by the principal to the third party to give rise to apparent authority.  An "indirect route" of transmission may well be sufficient as long as it was reasonable under the circumstances for the third party to conclude from the manifestations that the person has authority to act on the principal's behalf.  See id. at § 3.03, cmt. b; see also id. at § 2.03, cmt c (noting that apparent authority can be based on  "statements made by others concerning an actor's authority that reach the third party and are traceable

10

to the principal").

### b.  **Analysis**

MetaBank argues that no reasonable jury could find that Pickhinke acted with apparent authority in her dealings with the class because there is no evidence in the record to suggest that MetaBank ever made any "representations" directly to any members of the class concerning Pickhinke's authority to issue CDs. This argument is based on the mistaken premise that apparent authority can arise only from statements that are made directly by a principal to the third party that is making a claim of apparent authority. As I have explained, MetaBank's premise is false because apparent authority can arise from nonverbal manifestations by the principal and those manifestations need not be communicated directly by the principal to the third party as long as the third party's reasonable belief in the agent's apparent authority is traceable to the principal's manifestations.

In the present case, it is undisputed that MetaBank employed Pickhinke, that it gave her apparent authority to issue the CDs without the approval of supervisors, and that it allowed her to open accounts, authorize funds transfers into the bank's

FHLB account, and issue communications to third parties on the bank's letterhead.  It is also undisputed that MetaBank accepted deposits into its FHLB account from the victims and, over the course of several years, did nothing to suggest to the victims that it did not endorse the actions that Pickhinke ostensibly undertook on its behalf.  There is also evidence in the record to suggest that at least one of the CD brokers that was involved in causing the victims to participate in Pickhinke's fraudulent scheme was told by MetaBank that Pickhinke was the person to deal with at the bank with respect to CDs.  When this evidence is viewed in the light most favorable to the plaintiffs, it is more than sufficient to permit a reasonable jury to conclude that MetaBank's actions were sufficient  manifestations of Pickhinke's apparent authority to issue CDs on the bank's behalf to induce a reasonable person in the plaintiffs' position to believe that she in fact had that authority.

A reasonable jury could also conclude from the record that the actions of the CD brokers that caused plaintiffs to believe that they were purchasing CDs from MetaBank are traceable to MetaBank's own manifestations of Pickhinke's authority. Although a reasonable jury might eventually decide otherwise, it

12

certainly could conclude from the present record that the CD brokers made the representations to the victims that they made concerning Pickhinke's criminal scheme because MetaBank cloaked her with the apparent authority to act on its behalf.  Under these circumstances, MetaBank cannot defeat the plaintiffs' contract claim simply by asserting that the bank's manifestations of apparent authority were not communicated directly from MetaBank to the plaintiffs.

MetaBank also faults the plaintiffs for failing to investigate the scope of Pickhinke's authority to act on behalf of MetaBank before attempting to purchase the CDs, claiming that several internal policies prevented Pickhinke from being authorized to issue the kind of CDs involved in her scheme. This argument is a non-starter.  As I have explained, a third party ordinarily will not be faulted for failing to uncover undisclosed limitations on an agent's authority when the principal's manifestations concerning the agent's authority reasonably lead third parties to believe that the agent is authorized to undertake the action in question on the principal's behalf.  The case that MetaBank cites is not to the contrary.  In Carson v. Chicago, M & St. P. R. Co., 164 N.W.

13

747, 750 (Iowa 1917), the court endorsed the general principal

that "those dealing with agents are bound to know the extent of

the agent's authority."  However, the court went on to also

state that liability may nonetheless attach where "the party

dealing with the agent has been misled to his injury by the

principal's having clothed the agent with apparent or ostensible

authority to do the things he has done in excess of authority."

Id.  Taken together, these two rules essentially lay out a duty

to be aware of an agent's actual authority and an exception to

that duty where apparent authority has been manifested.  Here,

as I have explained, a jury could find both that the plaintiffs

reasonably believed that Pickhinke had apparent authority to

issue CDs on MetaBank's behalf and that those beliefs are

traceable to MetaBank's manifestations of Pickhinke's apparent

authority.  Under these circumstances, MetaBank cannot escape

liability by seeking to blame the plaintiffs for failing to

uncover its undisclosed limitations on Pickhinke's actual

authority.

MetaBank also makes a somewhat opaque claim that plaintiffs

have proffered insufficient evidence to support a contract claim

even if Pickhinke had apparent authority to issue CDs on

14

MetaBank's behalf.  This argument is also without merit.  If Pickhinke had apparent authority to act on MetaBank's behalf, it is quite clear that she used CD brokers to communicate offers to sell MetaBank CDs to the plaintiffs and that they accepted those offers by depositing funds into MetaBank's FLHB account. MetaBank plainly breached the contracts that resulted from this course of conduct if Pickhinke had apparent authority to act on its behalf by failing to return the principal and any undistributed interest when the CDs became due.  I need go no further to dispose of MetaBank's challenge to plaintiffs' contract claim.

### 2.  **Negligent Supervision**

Plaintiffs argue that MetaBank is liable for negligently hiring, retaining, and supervising Pickhinke.  MetaBank argues that it is entitled to summary judgment with respect to this claim because a bank does not owe third parties a duty to use reasonable care in hiring, retaining, and supervising employees. I reject this argument.

Iowa has followed the Restatement (Second) of Agency in recognizing the tort of negligent hiring, supervision and retention.  See Kiesau v. Bantz, 686 N.W.2d 164, 171-72 (Iowa

2004).  The Restatement explains the tort by stating that

> A person conducting an activity through servants or
> other agents is subject to liability for harm
> resulting from his conduct if he is negligent or
> reckless . . .
>       (b) in the employment of improper persons or
> instrumentalities in work involving risk of harm to
> others;
>       (c) in the supervision of the activity; or
>       (d) in permitting, or failing to prevent,
> negligent or other tortious conduct by persons,
> whether or not his servants or agents, upon premises
> or with instrumentalities under his control.

Id. (citing Restatement (Second) of Agency § 213 (1957)).  This

tort allows a plaintiff to recover damages from an employer for

torts committed by an employee even when the employee's conduct

is outside the scope of employment if "the employer's own

wrongful conduct has facilitated in some manner the tortious act

or wrongful conduct of the employee."  Id. at 172.

MetaBank attempts to challenge this basic tort law concept

by citing cases in which courts have determined that a bank

cannot be held liable for failing to prevent an unaffiliated

third party from using an account at the bank to commit fraud.

See, e.g., Eisenberg v. Wachovia Bank, N.A., 301 F.3d 220 (4th

Cir. 2002).  These cases, however, do not involve claims for

negligent hiring, supervision, and retention, and did not

involve the wrongful actions of bank employees.  That a bank does not have a general duty to protect non-customers from torts involving its accounts says nothing about its duty to adequately supervise its employees.  As the cases cited by MetaBank do not create a special rule for banks that exempts them from liability for failing to properly hire and supervise their employees, this argument fails.

### 3.   Vicarious Liability

Plaintiffs' third claim seeks to hold MetaBank vicariously liable for conversion and other torts committed by Pickhinke. Iowa follows the general common law rule in most other states in recognizing  that an employer is vicariously liable for the tort of an employee only if the employee committed the tort while acting within the scope of his or her employment.  Godar v. Edwards, 588 N.W.2d 701, 705 (Iowa 1999).  An act is within the scope of one's employment "where such act is necessary to accomplish the purpose of the employment and is intended for such purpose."  Id.

Plaintiffs acknowledge the general rule but they contend that the Iowa Supreme Court has also adopted a special rule of vicarious liability in Godar that permits a finding of vicarious

liability for acts committed outside the scope of employment if the court determines "that the loss resulting from the servant's acts should be considered as one of the normal risks to be borne by the business in which the servant is employed." Id. at 706. This "rule" is best understood, however, as an additional factor in the analysis of a vicarious liability claim rather than a distinct theory of liability.

The facts of Godar v. Edwards itself bear out this conclusion. After stating both the rules noted above, the Iowa Supreme Court held that when Edwards, a school curriculum director, committed sexual abuses against students, those acts could not be said to be in furtherance of the objectives of any school district programs. Id. at 707. Specifically, the court noted that "[t]he fact that Edwards' alleged conduct was incidental to duties authorized by the school district as curriculum director does not support a finding that the conduct furthered the educational objectives of the school district." Id. Thus, far from indicating that furthering the employer's objectives is not a necessary element of vicarious liability, the court explicitly relied on it in denying liability.

Here, as in Godar, Pickhinke's fraudulent scheme did not in any way further the objectives of MetaBank.  While her fraudulent conduct may have been incidental to duties authorized by her employer, that is not sufficient.  Similarly, the *de minimus* benefits realized by MetaBank in the form of wire transfer fees were merely incidental benefits and were not intended as part of Pickhinke's scheme.

Plaintiffs also rely on Riggan v. Glass, No. 7-065, 2007 Iowa App. LEXIS 344 (Iowa Ct. App. Mar. 28, 2007), for the proposition that furthering the objectives of the employer is not required.  That case, however, undermines rather than supports plaintiffs' argument.  In Glass, the CEO of a bank wrote fraudulent loans for customers and deposited the proceeds in his own account.  Id. at *2.  In finding that vicarious liability was not precluded as a matter of law, the appeals court noted first that "[o]ne of the purposes of his illegal conduct was to create the false impression that [the bank] had no bad loans and was extremely profitable."  Id. at *12.  Only after determining that Glass intended, at least partially, to benefit his employer, did the court go on to address whether the criminal conduct was a normal risk that should be borne by the

19

bank.  Id.  Thus the language cited by plaintiffs about "normal risks to be borne," when looked at in the context of the cases that use it, was clearly not meant to replace the requirement that an employee act and intend to accomplish the purpose of the employer.

Plaintiffs have not pointed to any facts indicating that Pickhinke intended to benefit MetaBank when she issued fraudulent CDs and created false accounts to use the funds to her own personal benefit, and without such facts its arguments that employee theft is a normal risk in the banking industry that should be borne by MetaBank are insufficient as a matter of law.

**4.   Attorney's Fees**

Finally, Plaintiffs seek attorney's fees in this matter. Iowa law allows a "rare exception" to the general rule against awarding attorney's fees where a party "has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." Hockenberg Equip. Co. v. Hockenberg's Equip. & Supply Co., 510 N.W.2d 153, 158 (Iowa 1993).  Hockenberg noted that the standard includes "voluntary blindness or an intentional failure to discover or prevent the wrong." Id. at 159 (internal brackets omitted).

Plaintiffs argue that MetaBank's actions illustrate willful blindness to Pickhinke's fraudulent scheme because the bank ignored its own Wire Transfer Policy, did not act on a 2005 audit that found its internal wire transfer controls inadequate, and received two warnings related to Pickhinke that resulted in internal investigations. Plaintiffs' argument fails, however, because the Hockenberg decision went on to make clear that "[t]hese terms envision conduct that is intentional and likely to be aggravated by cruel and tyrannical motives." Id.  In fact, the court held that the standard for attorney's fees is more stringent than the test for punitive damages, which is the "willful and wanton disregard for the rights of another."  Id.

Plaintiffs have not identified facts even close to satisfying this standard.  It is undisputed that MetaBank did not participate in Pickhinke's scheme, had no knowledge of it, and took prompt action to end the scheme as soon as it became aware of it.  The investigations of Pickhinke cited by plaintiffs concerned only her use of vacation time and did not discover the fraudulent scheme underlying this case.

Finally, plaintiffs argue that they should be granted attorney's fees because MetaBank has been "stubbornly

litigious."  See United Fire & Cas. Co. v. Shelly Funeral Home, Inc., 642 N.W.2d 648, 658 (Iowa 2002); Clark-Peterson Co., Inc. v. Indep. Ins. Assocs, Ltd., 514 N.W.2d 912, 916 (Iowa 1994). In Clark-Peterson, attorney fees were denied in an insurance case where the defendants "merely believed no coverage existed under the policy." 514 N.W.2d at 916.  Similarly, here defendants have simply litigated in good faith, and have not advanced frivolous arguments.  The fact that MetaBank's motion for summary judgment is partially granted by this order, while the remaining claims are sufficiently disputed to survive summary judgment, supports this conclusion.  MetaBank is entitled to summary judgment on plaintiffs' claim for attorney's fees.

**B.   Plaintiffs' Summary Judgment Motion**

Plaintiffs have filed their own motion for summary judgment.  It is, however, a rare case in which the party with the burden of proof will be entitled to summary judgment.  This is not such a case. It is sufficient to dispose of the motion to note that the motion must be denied because facts material to its resolution remain in genuine dispute.

## IV.   <u>CONCLUSION</u>

For the reasons stated above I grant MetaBank's motion for summary judgment (Doc. No. 103) in part and deny it in part and deny plaintiffs' motion for summary judgment (Doc. No. 102) in its entirety.

SO ORDERED.


<u>/s/Paul Barbadoro</u>
Paul Barbadoro
United States District Judge

July  14, 2011

cc:   Christopher T. Meier, Esq.
      Randall F. Cooper, Esq.
      Bruce Felmly, Esq.
      Christine B. Cesare, Esq.
      Howard M. Rogatnick, Esq.
      Ronald Joshua Bliss, Esq.
      Cathryn E. Vaughn, Esq.